# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:18-cr-115-NT |
| | ) |
| ROBERT SIMPKINS, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Robert Simpkins is charged with possession of oxycodone with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute and possess with the intent to distribute oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 846. Before me is the Defendant's motion to suppress statements that he made and evidence that was seized during a roadside search of his vehicle on April 28, 2018. (ECF No. 36.) I held a hearing on the Defendant's motion on December 3, 2018, and the parties submitted supplemental evidence and written summations on December 10, 2018. For the reasons set out below, I **DENY** the motion to suppress.

## FINDINGS OF FACT[1]

In March of 2018, the Maine State Police ("**MSP**") conducted a traffic stop on a vehicle and discovered that the operator was in possession of a distributable amount of oxycodone and suboxone strips. The operator began cooperating with the MSP in an attempt to receive more favorable treatment on his pending criminal charges. As

---

[1] The facts set out below are drawn from the testimony of Maine State Police ("**MSP**") Sergeant Tom Pappas, MSP Trooper Jodell Wilkinson, MSP Trooper Jesse Duda, U.S. Drug Enforcement Administration ("**DEA**") Special Agent Michael Gagnon, and DEA Task Force Officers Justin Huntley, David Verity, and Martin Hames and from the exhibits offered by the parties.

part of that cooperation, the cooperating defendant ("**CD**"), told officers that he had purchased the drugs from "Rob," who lived in Rhode Island. The CD provided officers with "Rob's" cellular telephone number, a description of his residence, and the make, model, and color of his vehicle. Through independent research, officers determined that the phone number was associated with Robert Simpkins, and they found an address for Simpkins. Using Google Earth, the police found a picture of Simpkins' residence that not only matched the description of the residence provided by the CD but also showed a vehicle that matched the CD's information. When presented with a photograph of Robert Simpkins that the police obtained from the Rhode Island Division of Motor Vehicles, the CD confirmed that it was a picture of "Rob." The CD admitted that he had purchased drugs from Simpkins on approximately 25-30 occasions, and he showed police officers his text messages with Simpkins, which are consistent with drug sales.[2] Although most of those sales occurred in Rhode Island, Simpkins occasionally traveled to Maine.

Officers decided to have the CD arrange for Simpkins to travel to Maine. In a recorded call made on April 4, 2018, the CD told Simpkins that he was having trouble with his vehicle and was unable to make the trip to Rhode Island. Gov't Exs. 3, 3-T. In a second, unrecorded call, Simpkins agreed to travel to Maine on April 28, 2018. On April 28, 2018, the CD confirmed that Simpkins was coming and asked Simpkins to let him know the price of the drugs before Simpkins left. Gov't Exs. 4, 4-T. Simpkins

---

[2] These messages include, "the[y're] 120 g's," "[a]nd 80 pink," "what are the pinks," "10's," "how mu[]ch are the pinks," "8 I think," "I will take the green ones," "[h]ow m[a]ny strips?" "100 but u can split if u need 2." Gov't Exs. 1A-E.

sent the CD a text that read: "heading out about 2…. 3850 if it ain't short." Gov't Ex. 5.

Based on the exchanges between the CD and Simpkins, agents with the DEA task force in Rhode Island started surveillance of Simpkins' home. Over a 45 minute period, DEA Task Force Officer ("**TFO**") Martin Hames observed Simpkins load his vehicle with items, including a box, a plastic bag, and a pillow. Simpkins locked his vehicle between trips from the house to the car and scanned the area in a manner consistent with someone checking to see if he was being watched. Simpkins left his residence shortly before 2:00 p.m., and officers observed him stop in a nearby neighborhood. Another vehicle arrived, and Simpkins exited his own vehicle and entered the passenger seat of the other vehicle. The second vehicle drove a short distance before it made a U-turn and returned to where Simpkins' vehicle was parked. Simpkins went back to his vehicle and began driving north.

MSP officers were waiting for Simpkins to arrive in Maine. When he did, he was stopped by three MSP officers, each driving a separate marked cruiser. The officers ordered Simpkins out of his vehicle at gunpoint, yelled at him to get on his knees, and handcuffed him.[3] Once Simpkins was handcuffed, an officer asked, "do you have anything on you?" Simpkins replied that he had a pocketknife but was otherwise unarmed. During a patdown search, MSP Sergeant Tom Pappas noticed an item and asked "what's that?" Simpkins replied, "just a little bit of fentanyl."

---

[3] The MSP followed procedures for a high-risk arrest because they knew that Simpkins owned multiple firearms and other weapons from a Rhode Island police report involving a mental wellness check made on Simpkins earlier in the year.

MSP Officer Jodell Wilkinson deployed her drug-detection dog first outside of the vehicle and then inside. The dog, which was trained to detect cocaine, crack cocaine, heroin, and marijuana, did not alert to the scent of drugs during either sweep. Following the dog sniff, a team of officers began a hand search of Simpkins' car. Officers discovered an envelope in the vehicle that contained 11 Suboxone strips. Over an hour into the search, Officer Wilkinson found a smell-resistant bag inside of a lamp in the vehicle's trunk. The bag contained 200 oxycodone pills, 5 grams of cocaine, 28 methadone pills, 15 Viagra pills, 20 amphetamine pills, and 6 Suboxone strips.

Approximately an hour after the stop and before officers found the bag with the opioids, DEA TFO Justin Huntley began a recorded interview with Simpkins in a police cruiser. After introducing himself and asking Simpkins' name, TFO Huntley read Simpkins his *Miranda* rights. Gov't Exs. 6B, 6B-T. TFO Huntley then informed Simpkins that he was being investigated for drug trafficking, and Simpkins repeatedly denied that he was trafficking drugs. From the cruiser, Simpkins could see the officers conducting the hand search of his vehicle. When he saw Officer Wilkinson open the lamp, Simpkins told TFO Huntley, "she found it all." Simpkins was then formally arrested.

## DISCUSSION

The Defendant argues that the officers: (1) lacked probable cause to conduct a search of his vehicle; (2) were not justified in searching the vehicle incident to his

arrest; and (3) subjected him to custodial interrogation without properly informing him of his Fifth Amendment rights.

**I.   Probable Cause to Search**

I first consider the Defendant's argument that the officers lacked probable cause to search his vehicle in light of the CD's lack of credibility, the officers' failure to corroborate crucial pieces of information provided by the CD, and the dog's failure to alert. Police are usually required to secure a warrant before conducting a search. U.S. Const. amend. IV. Because of the mobility of vehicles, *California v. Carney*, 471 U.S. 386, 390 (1985), and the "diminished expectation of privacy in automobiles," however, officers may search a vehicle without a warrant if they have probable cause to believe that evidence of a crime will be found. *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (citing *California v. Acevedo*, 500 U.S. 565, 579 (1991)). "Probable cause only exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Gonsalves*, 859 F.3d 95, 103 (1st Cir. 2017) (alteration, quotation marks, and citation omitted), *cert. denied*, 138 S. Ct. 367 (2017), and *cert. denied*, 138 S. Ct. 691 (2018).

Where "the police act on information from a confidential informant, 'law enforcement must provide some information from which a court can credit the informant's credibility.'" *Gonsalves*, 859 F.3d at 103 (quoting *United States v. White*, 804 F.3d 132, 136 (1st Cir. 2015)). Factors relevant to an informant's credibility include "(1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or

all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information." *Id.* (quotation marks omitted). "Corroboration of even innocent activity reported in the tip may support a finding of probable cause." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (alteration and quotation marks omitted)).

In this case, the CD met with officers in person, and, although the CD had not previously worked with officers, the CD had knowledge of the Defendant's drug sales based on prior, regular purchases from the Defendant that were corroborated by text messages between the two. The officers corroborated much of the information the CD provided about "Rob." Specifically, "Rob's" phone number was associated with the Defendant; the address associated with the phone number matched the CD's description of "Rob's" residence; and the color, make, and model of the Defendant's vehicle matched the CD's description. The CD also confirmed that the Department of Motor Vehicles picture of the Defendant was "Rob." The phone calls and text messages recorded and observed by the agents were strong evidence that the Defendant was and had been supplying the CD with oxycodone and suboxone. The information provided by the CD was further bolstered by the officer's observations of the Defendant in Rhode Island before he left his house. The Defendant appeared to be checking his surroundings each time he brought items to his car, and each time he went back into his house he relocked the vehicle. Additionally, the strange meet up with another vehicle just before the Defendant was scheduled to leave Rhode Island

added to the officers' suspicions. The officers had ample evidence to support their belief that the Defendant was transporting drugs into Maine in his vehicle.

The Defendant argues that any probable cause that existed when he was initially stopped dissipated when Officer Wilkinson's dog failed to alert to the presence of drugs in the vehicle. A dog's failure to alert to the presence of narcotics is a relevant factor in determining whether probable cause exists. *United States v. Jodoin*, 672 F.2d 232, 236 (1st Cir. 1982), *abrogated on other grounds by Bloate v. United States*, 559 U.S. 196 (2010). But a "dog's failure to react does not . . . destroy the 'probable cause' " that exists where officers have other strong independent evidence that supports probable cause. *Id.* Particularly where, as here, the dog was not trained to identify prescription opiates, I do not find that the dog's failure to alert to the presence of oxycodone and suboxone undermines probable cause.[4]

The Defendant also argues that the search of the vehicle was not justified as being incident to arrest. Because I conclude that the officers had probable cause to support the vehicle search, I do not address whether the search was also justified as being incident to arrest.

## II. *Miranda* Warnings

I next consider the Defendant's argument that statements he made to the officers must be suppressed because he was subjected to custodial interrogation without receiving *Miranda* warnings. " '[A] person questioned by law enforcement

---

[4] Sergeant Pappas credibly testified that the MSP use dogs for drug stops, even where the dog is not trained to detect the substance that the officers have reason to suspect will be found. Officer Wilkinson confirmed that sometimes officers deploy a dog to give the dog experience rather than to build probable cause.

officers after being taken into custody or otherwise deprived of his freedom of action in any significant way must first' receive *Miranda* warnings." *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) (alteration in original) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). "Any statements obtained as a result of custodial interrogation in the absence of *Miranda* warnings must be suppressed." *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008). An exception to the general *Miranda* rule "is that *Miranda* warnings need not precede 'questions necessary to secure [an officer's] own safety or the safety of the public' for a suspect's answers to be admissible as evidence of his guilt." *United States v. Fox*, 393 F.3d 52, 60 (1st Cir. 2004) (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)), *cert. granted, judgment vacated on other grounds*, 545 U.S. 1125 (2005).

### A. Initial Statement About Fentanyl

Soon after the Defendant was ordered out of the vehicle, the officers conducted a pat down search for weapons. At that time, Sergeant Pappas and the Defendant had the following exchange:

Sergeant Pappas: "Do you have anything on you?"

Defendant: "Just that pocket knife. That's it, sir."

Sergeant Pappas: "What's that? What is that?"

Defendant: "Just a little bit of fentanyl."

Gov't Ex. 7. The Defendant was then placed in a police cruiser in handcuffs.[5] Within seconds, officers observed the Defendant reaching for his pocket, so they removed him from the vehicle, took him to the ground, and removed the fentanyl.

The Defendant concedes that the officers had a legitimate basis to conduct a pat down search for weapons but argues that the officers exceeded the scope of a pat down for officer safety because the small container of fentanyl could not have been mistaken for a weapon. Def.'s Br. 2 (ECF No. 45). The Defendant failed to raise the issue of the scope of the search before or at the evidentiary hearing, but rather addressed it for the first time in his post-hearing Brief. The Defendant has, therefore, waived this argument. The Defendant's lapse leaves me unable to consider the issue as a practical matter, because the Government did not have reason or opportunity to present evidence to justify the search. I would be left to guess which of the various exceptions to the warrant requirement may apply.[6]

### B. Post-*Miranda* Statements

In his motion to suppress, the Defendant alleged that he was not given *Miranda* warnings. The video from inside a police cruiser establishes that TFO Huntley gave the Defendant *Miranda* warnings. The Defendant now makes two

---

[5] MSP Sergeant Pappas testified that he placed the Defendant in the vehicle before he removed the fentanyl so that officers could search the vehicle to determine if anyone else was inside.

[6] For instance, while there was testimony that the container was in the Defendant's jean coin pocket, there is conflicting evidence as to whether the fentanyl was contained in a baggie or a plastic container and no evidence as to whether an officer could see the contraband on the defendant. *See United States v. Proctor*, 148 F.3d 39, 43 (1st Cir. 1998) ("plain-view" and "plain-feel" exceptions to warrant requirement).

arguments: (1) that he did not affirmatively waive his rights; and (2) that he invoked his right to remain silent later in the questioning. Def.'s Br. 2.

The Defendant contends that he did not give a full waiver of his rights when, after reading the Defendant his rights, the officer began questioning without waiting for an answer to the final question: "Having all of these rights in mind . . . do you wish to answer questions at this time?" Police officers are "not required to obtain a waiver of [a suspect's] right to remain silent before interrogating him." *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010); *see also id.* at 383 ("[W]aivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered."). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384. The Defendant told TFO Huntley that he understood each of the five rights that TFO Huntley read to him. *See* Gov't Exs. 6B, 6B-T. There is no evidence that the Defendant's statements were coerced, and, accordingly, I find that the Defendant's responses to TFO Huntley were an implied waiver of his right to remain silent. *See Berghuis*, 560 U.S. at 384.

Second, later in the interrogation, TFO Huntley stated, "now would be a great time to think about being honest and . . . ." The Defendant interrupted, "sir, I have nothing to say." But he did have more to say. Before TFO Huntley said anything, the Defendant continued:

> I didn't do anything. You guys tore apart my car. I was trying to be nice this entire time and you've been nice. You have been a stand up guy. I, I will give you that.

Gov't Exs. 6B, 6B-T. And from there the questions and answers continued. Gov't Exs. 6B, 6B-T at 4. In order to invoke the right to remain silent, a suspect must do so unambiguously. *Berghuis*, 560 U.S. at 381 (extending holding of *Davis v. United States*, 512 U.S. 452, 459 (1994), which required an unambiguous invocation of the right to counsel). In context, the Defendant was protesting his innocence, not asserting his right to remain silent.[7]

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to suppress.

SO ORDERED.

/s Nancy Torresen

United States District Judge

Dated this 9th day of January, 2019.

---

[7] In fact, later in the interrogation, the Defendant used the same phraseology to deny wrongdoing: "Sir, I have nothing to say. I'm not part of a drug conspiracy. You guys have the wrong guy." Gov't Exs. 6B, 6B-T at 20.